Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISSLAW LLP**
9100 Wilshire Blvd., #725 E.
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHERINE COFFMAN,<br><br>Plaintiff,<br><br>vs.<br><br>GW PHARMACEUTICALS PLC, GEOFFREY GUY, JUSTIN GOVER, CABOT BROWN, DAVID GRYSKA, CATHERINE MACKEY, JAMES NOBLE, ALICIA SECOR, and WILLIAM WALDEGRAVE,<br><br>Defendants. | Case No. **'21CV537   BEN RBB**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Catherine Coffman ("Plaintiff"), on behalf of herself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through her counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for her Complaint:

- 1 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# NATURE OF THE ACTION

1. This is an action brought by Plaintiff against GW Pharmaceuticals plc ("GW" or the "Company") and the members of GW's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which GW will merge with Jazz Pharmaceuticals Public Limited Company ("Jazz") through Jazz's wholly owned subsidiary Jazz Pharmaceuticals UK Holdings Limited ("Bidco") (the "Proposed Transaction").

2. On February 3, 2021, GW and Jazz issued a joint press release announcing that they had entered into a transaction agreement dated February 3, 2021 (the "Merger Agreement") to sell GW to Jazz. Under the terms of the Merger Agreement, holders of GW ordinary shares will receive $16.66 \,{}^{2}\!/_{3}$ in cash plus an amount of Jazz ordinary shares equal to an exchange ratio that will be calculated based upon Jazz's share price, and holders of American Depositary Shares of GW ("GW ADSs") will receive approximately $220 in cash and $20 in Jazz stock in consideration for their GW ADSs (the "Merger Consideration").

3. On March 15, 2021, GW filed a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the SEC. The Proxy Statement, which recommends that GW stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things, the Company's and Jazz's financial projections and the financial analyses supporting the fairness opinions provided by the Board's financial advisors, Centerview Partners LLC ("Centerview") and Goldman Sachs & Co. LLC ("Goldman"). Defendants authorized the issuance of the false and misleading Proxy Statement in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.     In short, unless remedied, GW's public stockholders will be irreparably harmed because the Proxy Statement's material misrepresentations and omissions prevent them from making a sufficiently informed voting decision on the Proposed Transaction.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

6.     The Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company maintains an administrative office located in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of GW.

9.     Defendant GW is a public limited company incorporated in England and Wales, with its principal executive offices located at Sovereign House, Vision Park, Chivers Way, Histon, Cambridge CB24 9BZ, United Kingdom and an administrative office located at 5750 Fleet Street, Suite 200, Carlsbad, California.  The Company is a biopharmaceutical company focused on

- 3 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

discovering, developing and commercializing novel therapeutics from its proprietary cannabinoid product platform in a broad range of disease areas. GW ADSs trade on the Nasdaq Global Select Market under the ticker symbol "GWPH."

10. Defendant Geoffrey Guy ("Guy") is the founder of the Company and has served as Chairman of the Board and a director since 1998.

11. Defendant Justin Gover ("Gover") has been President, Chief Executive Officer ("CEO"), and a director of the Company since January 1999.

12. Defendant Cabot Brown ("Brown") has been a director of the Company since 2013.

13. Defendant David Gryska ("Gryska") has been a director of the Company since September 2020.

14. Defendant Catherine Mackey ("Mackey") has been a director of the Company since 2017.

15. Defendant James Noble ("Noble") is Lead Independent Director and Deputy Chairman of the Board, and has been a director of the Company since 2007.

16. Defendant Alicia Secor ("Secor") has been a director of the Company since 2017.

17. Defendant William Waldegrave ("Waldegrave") has been a director of the Company since 2017.

18. Defendants identified in paragraphs 10-17 are referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

19. Jazz is a public limited company incorporated in the Republic of Ireland with its executive offices located at Fifth Floor, Waterloo Exchange, Waterloo Road, Dublin 4, Ireland D04 E5W7. Jazz is a global biopharmaceutical company dedicated to developing and commercializing life-changing medicines that transform the lives of patients with serious diseases. It has a diverse

portfolio of marketed medicines and novel product candidates, from early- to late-stage development, in key therapeutic areas. Jazz's common stock trades on the Nasdaq Global Select Market under the ticker symbol "JAZZ."

20.     Bidco is a private limited company incorporated in England and Wales and an indirect wholly owned subsidiary of Jazz.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

21.     GW is a biopharmaceutical company focused on discovering, developing and commercializing novel therapeutics from its proprietary cannabinoid product platform in a broad range of disease areas. In over 20 years of operations, the Company has established a world leading position in the science, development and commercialization of plant-derived cannabinoid therapeutics through its proven drug discovery and development processes, intellectual property portfolio, and regulatory, manufacturing and commercial expertise.

22.     GW's lead cannabinoid product is Epidiolex, a pharmaceutical formulation comprising highly purified plant-derived cannabidiol ("CBD") for which GW retains global commercial rights. The Company initially launched Epidiolex in the U.S. in November 2018 for the treatment of seizures associated with Lennox-Gastaut syndrome ("LGS") and Dravet syndrome for patients two years of age and older. In July 2020, the U.S. Food and Drug Administration ("FDA") expanded the approval of Epidiolex, adding a new indication of seizures associated with Tuberous Sclerosis Complex ("TSC"). The FDA also approved the expansion of all existing indications, LGS, Dravet syndrome and TSC, to patients one year of age and older. LGS and Dravet syndrome are severe childhood-onset, drug-resistant epilepsy syndromes. TSC is a rare genetic disorder that causes non-malignant tumors to form in many different organs and affects approximately 50,000 individuals in the United States and one million worldwide. GW has received Orphan Drug Designation from

the FDA and the Committee for Orphan Medical Products ("COMP") for TSC.  GW previously received the same designations for LGS and Dravet syndrome.

23.     The Company also has a deep pipeline of additional cannabinoid product candidates that includes compounds in Phase 1, Phase 2, and Phase 3 trials.

24.     On August 7, 2020, GW announced its fourth quarter 2020 financial results and operational highlights, reporting for the quarter total revenue of $148.2 million, compared to $109.1 million for the fourth quarter of 2019.  Total revenue for the full-year 2020 was $527.2 million, a 69% increase compared to $311.3 million for the prior year period.  The Company also reported progress for several of its products, including: total net product sales of Epidiolex of $144.1 million for the fourth quarter and $510.5 million for the year ended December 31, 2020; expanded payer coverage for Epidiolex to more than 110 million lives with no/broad prior authorization, a 70% increase in 2020; and outside the US, GW expanded the global reach of epidiolex, with pricing and reimbursement approved in Germany, Finland and Israel.  Reflecting on the Company's results and looking towards the future, defendant Gover stated:

> We are very proud of our strong financial performance and operational progress in 2020, as Epidiolex sales increased by more than 70% during the year despite the challenges of COVID-19.  We are well positioned to build on our success and continue to deliver strong growth in 2021 in both the U.S. and Europe, where we continue to make progress preparing for several commercial launches that are expected later this year.  We have commenced our Phase 3 clinical program for nabiximols in the treatment of multiple sclerosis spasticity, which provides multiple opportunities for an NDA submission.  Beyond nabiximols, we are advancing a diverse and robust neuroscience pipeline with several preclinical and clinical-stage pipeline candidates as part of our commitment to patients and to developing innovative medicines that address significant unmet needs.  We have strong momentum and a tremendous opportunity to continue to build on our global cannabinoid leadership position as we prepare to join Jazz Pharmaceuticals and transform the lives of even more patients and families.

**The Proposed Transaction**

25.     On February 3, 2021, GW and Jazz issued a joint press release announcing the Proposed Transaction.  The press release states, in relevant part:

DUBLIN and LONDON, Feb. 3, 2021 -- Jazz Pharmaceuticals plc (Nasdaq: JAZZ) and GW Pharmaceuticals plc (Nasdaq: GWPH) today announced the companies have entered into a definitive agreement for Jazz to acquire GW for $220.00 per American Depositary Share (ADS), in the form of $200.00 in cash and $20.00 in Jazz ordinary shares, for a total consideration of $7.2 billion, or $6.7 billion net of GW cash. The transaction, which has been unanimously approved by the Boards of Directors of both companies, is expected to close in the second quarter of 2021.

Upon close of the transaction, the combined company will be a leader in neuroscience with a global commercial and operational footprint well positioned to maximize the value of its diversified portfolio.

GW is a global leader in discovering, developing, manufacturing and commercializing novel, regulatory approved therapeutics from its proprietary cannabinoid product platform to address a broad range of diseases. The company's lead product, Epidiolex® (cannabidiol) oral solution, is approved in patients one-year and older for the treatment of seizures associated with Lennox-Gastaut Syndrome (LGS), Dravet Syndrome and Tuberous Sclerosis Complex (TSC), all of which are rare diseases characterized by severe early-onset epilepsy. Epidiolex was the first plant-derived cannabinoid medicine ever approved by the U.S. Food and Drug Administration (FDA). This product has also been approved, under the tradename Epidyolex®, by the European Medicines Agency (EMA) in patients two years of age and older for the adjunctive treatment of seizures associated with LGS and Dravet syndrome in conjunction with clobazam and is under EMA review for the treatment of seizures associated with TSC. In addition to the approved indications for Epidiolex, there are considerable opportunities to pursue other indications within the epilepsy field, including other treatment-resistant epilepsies where significant unmet needs of patients exist.

Beyond Epidiolex, GW has a scientific platform and deep innovative pipeline of cannabinoid product candidates, as well as highly specialized manufacturing expertise, developed over two decades of pioneering and building leadership in cannabinoid science. This pipeline includes nabiximols, for which the company is in Phase 3 trials to seek FDA approval for treatment of spasticity associated with multiple sclerosis and spinal cord injury, as well as earlier-stage cannabinoid product candidates for autism and schizophrenia.

"Jazz is proud of our leadership position in sleep medicines and rapidly growing oncology business. We are excited to add GW's industry-leading cannabinoid platform, innovative pipeline and products, which will strengthen and broaden our neuroscience portfolio, further diversify our revenue and drive sustainable, long-term value creation opportunities," said Bruce Cozadd, chairman and CEO of Jazz Pharmaceuticals. "We are joining two teams that share a passion for, and track record of, developing differentiated therapies that advance science and transform the lives of patients. This will help facilitate a successful integration and bring added capabilities to Jazz. Given the strength of our balance sheet and the meaningful financial drivers of the transaction, we are confident in the value we can deliver to both companies'

shareholders and patients.  We look forward to welcoming the GW team to Jazz to build an even stronger company."

"Over the last two decades, GW has built an unparalleled global leadership position in cannabinoid science, including the successful launch of Epidiolex, a breakthrough product within the field of epilepsy, and a diverse and robust neuroscience pipeline.  We believe that Jazz is an ideal growth partner that is committed to supporting our commercial efforts, as well as ongoing clinical and research programs," said Justin Gover, CEO of GW Pharmaceuticals.  "We have a shared vision of developing and commercializing innovative medicines that address significant unmet needs in neuroscience and an approach of putting patients first.  Together, we will have an opportunity to reach and impact more patients through a broader portfolio of neuroscience-focused therapies than ever before."

Creates an Innovative, High-Growth, Global Biopharma Leader with Financial Strength

- **Adding a Third High-Growth Commercial Franchise**:  The transaction enhances product diversification through the addition of a third high-growth commercial franchise for critical unmet patient needs within: 1) sleep disorders, 2) oncology, and 3) epilepsies.  Specifically, the acquisition will expand Jazz's growing neuroscience business by adding Epidiolex, a global, high-growth childhood-onset epilepsy franchise with near-term blockbuster potential.

  GW has rapidly scaled Epidiolex, achieving approximately $510 million in annual sales within two years of launch and broad access to date, with more than 97% of U.S. lives covered.  Epidiolex addresses significant unmet needs in the field of epilepsy and offers the potential for a substantial improvement in outcomes for patients who were previously drug resistant.  The combined company will create a neuroscience leader with a global franchise and complementary therapeutic expertise, to maximize the value of XywavTM (calcium, magnesium, potassium, and sodium oxybates) oral solution, Epidiolex, and other neuroscience products.

- **Robust Combined Pipeline in Neuroscience and Oncology to Drive Sustainable Growth**: GW's novel cannabinoid platform will expand and diversify Jazz's growing neuroscience pipeline.  The collective Jazz and GW teams will bring highly complementary expertise to a pro-forma pipeline of 19 clinical development programs across neuroscience and oncology, including in sleep, epilepsy, movement disorders, psychiatry, hematology and solid tumors.  Following the close of the transaction, the combined portfolio will include highly differentiated assets addressing significant unmet patient needs, which, when combined with complementary commercial models, accelerates Jazz's growth strategy.

- **Shared Culture and Exceptional Talent Will Advance Mission to Transform the Lives of Patients**:  Jazz and GW are focused on developing

- 8 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

life-changing medicines for people with serious diseases, often with limited or no treatment options. Jazz's and GW's global teams possess unique talents and expertise and have proven capability to develop and launch differentiated therapies to support often-overlooked patient populations. Both companies are guided by shared values that include integrity, collaboration, passion, innovation and pursuit of excellence, and have cultures where diversity, equity and inclusion are a priority. The transaction brings together two companies with a significant presence in the United Kingdom, which is expected to remain an important part of the combined enterprise.

- **Expected to Deliver Substantial Shareholder Value**: The combination is expected to provide accelerated double-digit top-line revenue growth and to be accretive in the first full year of combined operations and substantially accretive thereafter. Jazz's strong cash flow profile provides the capability to rapidly deleverage to a target net leverage of less than 3.5x by the end of 2022.

**Transaction Terms**

Under the terms of the agreement, holders of GW ADSs, which each represent 12 GW ordinary shares, will be entitled to receive $220.00 for each GW ADS, of which $200.00 will be paid in cash and $20.00 in Jazz ordinary shares. This represents a premium of approximately 50 percent over GW's closing stock price on February 2, 2021, of $146.25 and 60 percent over GW's 30-day volume weighted average price of $137.17.

The number of Jazz ordinary shares to be issued to the holders of GW ADSs will be based on the volume-weighted average price of Jazz's ordinary shares over a 15 trading day period preceding the closing date of the transaction, subject to limitations on the maximum and minimum number of Jazz ordinary shares issuable per GW ADS based on a price range of $139.72 to $170.76 per Jazz ordinary share. Holders of GW ordinary shares that are not in ADS form will be entitled to receive the foregoing consideration divided by 12 per ordinary share.

The cash portion of the transaction consideration is expected to be funded through a combination of cash on hand and debt financing. Jazz has obtained fully committed debt financing from BofA Securities and J.P. Morgan Securities LLC. The financing includes a meaningful portion of pre-payable debt, in line with Jazz's commitment to rapid deleveraging.

**Closing Conditions**

The transaction has been unanimously approved by the Boards of Directors of both companies, and is subject to the approval of GW shareholders, sanction by the High Court of Justice of England and Wales and other customary closing conditions, including regulatory approvals. Subject to the satisfaction or waiver of the closing conditions, the transaction is expected to close in the second quarter of 2021.

**Insiders' Interests in the Proposed Transaction**

26.     GW insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of GW.

27.     Notably, Company insiders stand to reap substantial financial benefits for securing the deal with Jazz. Upon consummation of the Proposed Transaction, all unvested Company share options granted before February 3, 2021, all unvested Company share options granted following February 3, 2021 to non-employee directors, and one-third of unvested Company share options granted to GW's employees following February 3, 2021, will be converted into the right to receive cash payments, as set forth in the following tables:

| Name | Unvested Share Options (# GW ADSs) | ($) | Total ($) |
|---|---|---|---|
| *Directors* | | | |
| James Noble | 6,381 | $1,166,519 | $1,166,519 |
| Cabot Brown | 6,381 | $1,166,519 | $1,166,519 |
| Catherine Mackey | 6,381 | $1,166,519 | $1,166,519 |
| Alicia Secor | 6,381 | $1,166,519 | $1,166,519 |
| William Waldegrave | 6,381 | $1,166,519 | $1,166,519 |
| David Gryska | 4,806 | $1,057,224 | $1,057,224 |

| Name | Unvested Pre-2021 Share Options (# GW ADSs) | ($) | Unvested 2021 Share Options (# GW ADSs) | ($) | Total ($) |
|---|---|---|---|---|---|
| *Executive Officers* | | | | | |
| Geoffrey Guy | 53,742 | $10,743,561 | 17,836 | $3,923,876 | $14,667,437 |
| Justin Gover | 105,788 | $21,103,706 | 35,639 | $7,840,518 | $28,944,224 |
| Darren Cline | 38,150 | $7,563,099 | 10,159 | $2,235,080 | $9,798,179 |
| Scott Giacobello | 32,576 | $6,532,636 | 9,495 | $2,088,710 | $8,621,346 |
| Volker Knappertz | 35,185 | $7,048,315 | 10,357 | $2,278,479 | $9,326,794 |
| Douglas Snyder | 33,920 | $6,793,196 | 9,820 | $2,160,422 | $8,953,618 |
| Chris Tovey | 30,169 | $6,033,924 | 9,136 | $2,009,737 | $8,043,661 |
| Adam D. George | 2,676 | $588,720 | — | — | $588,720 |

28.     Moreover, GW has agreed that the executive officers would be eligible to receive the Transition Incentive Bonuses. Under the terms of the Merger Agreement, to retain and incentivize their continued service throughout the transition period, the Company will pay such bonuses to its executive officers in the following amounts: defendant Gover—$7,600,000; Mr. Darren Cline—

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

$2,300,000; Mr. Scott Giacobello—$2,550,000; Mr. Douglas Snyder—$2,600,000; and Dr. Volker Knappertz—$2,600,000.

29. Additionally, if they are terminated in connection with the Proposed Transaction, GW's named executive officers will receive substantial cash severance payments in the form of golden parachute compensation as set forth in the following table:

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites / Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Dr. Geoffrey Guy | $ 1,215,113 | $ 14,667,437 | $ 6,210 | $ 15,888,760 |
| Justin Gover | $ 10,071,472 | $ 28,944,224 | $ 42,240 | $ 39,057,936 |
| Scott Giacobello | $ 3,637,101 | $ 8,621,346 | $ 46,680 | $ 12,305,127 |
| Dr. Volker Knappertz | $ 3,798,681 | $ 9,326,794 | $ 46,680 | $ 13,172,155 |
| Douglas Snyder | $ 3,742,806 | $ 8,953,618 | $ 46,680 | $ 12,743,104 |

**The Proxy Statement Contains Material Misstatements or Omissions**

30. Defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to GW's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

31. Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning the Company's and Jazz's financial projections and the financial analyses supporting the fairness opinions provided by the Board's financial advisors, Centerview and Goldman.

***Material Omissions Concerning the Company's and Jazz's Financial Projections and Centerview's and Goldman's Financial Analyses***

32. The Proxy Statement omits material information regarding the Company's and Jazz's financial projections.

33. For example, with respect to each of the "July Forecasts" and "December Forecasts" for GW, the Proxy Statement fails to disclose the "assessments by GW management of the probability

- 11 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of success ("POS") for each of the products and product candidates in the indications covered by" the respective forecasts. Proxy Statement at 83, 84.

34. With respect to the "December Forecasts" for GW, the Proxy Statement further fails to disclose all line items underlying the calculation of unlevered free cash flow and unlevered free cash flow (excl. unallocated R&D). The Proxy Statement also fails to disclose the unlevered free cash flows to be generated from each of Epidiolex through 2026, Epidiolex post 2026, nabiximols / Sativex, New Organic Products and Platform, each as utilized by Goldman in its *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis.*

35. In addition, with respect to the "July Forecasts" for GW, the Proxy Statement fails to disclose unlevered free cash flow, unlevered free cash flow (excl. unallocated R&D) and the underlying line items for each, as well as the unlevered free cash flows to be generated from each of Epidiolex through 2026, Epidiolex post 2026, nabiximols / Sativex, New Organic Products and Platform, to the extent they exist.

36. Moreover, the Proxy Statement fails to disclose any financial projections for Jazz.

37. The Proxy Statement also omits material information regarding Centerview's and Goldman's financial analyses.

38. The Proxy Statement describes Centerview's and Goldman's fairness opinions and the various valuation analyses performed in support of their opinions. However, the description of Centerview's and Goldman's fairness opinions and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, GW's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Centerview's and Goldman's fairness opinions in determining whether to vote in favor of the Proposed Transaction.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

39. With respect to Centerview's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) quantification of the inputs and assumptions underlying the discount rates ranging from 9.5% to 11.5%; (ii) quantification of GW's terminal value; and (iii) the number of fully diluted outstanding GW ADS-equivalent GW ordinary shares.

40. With respect to Centerview's *Sensitivity Analysis*, the Proxy Statement fails to disclose the assumptions Centerview utilized with respect to Epidiolex and nabiximols, including, but not limited to, loss of exclusivity, peak sales, probability of additional indications and timing of approvals.

41. With respect to Centerview's *Analyst Price Targets Analysis*, the Proxy Statement fails to disclose: (i) the individual price targets observed; and (ii) the sources thereof.

42. With respect to Goldman's *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) quantification of the inputs and assumptions underlying the discount rates ranging from 9.5% to 11.5%; (ii) terminal year estimate of the unlevered free cash flow to be generated by GW utilized in the analysis; (iii) quantification of GW's terminal value; and (iii) the number of fully diluted outstanding GW ADS-equivalent GW ordinary shares.

43. With respect to Goldman's *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis*, in addition to the unlevered free cash flows to be generated from each of Epidiolex through 2026, Epidiolex post 2026, nabiximols / Sativex, New Organic Products and Platform, the Proxy Statement fails to disclose: (i) quantification of the inputs and assumptions underlying the discount rates ranging from 9.5% to 11.5%; (ii) the metric to which Goldman applied perpetuity growth rates to derive the terminal values and quantification thereof; (iii) quantification of the terminal values; and (iv) the number of fully diluted outstanding GW ADS-equivalent GW ordinary shares.

44. Without such undisclosed information, GW stockholders cannot evaluate for themselves whether the financial analyses performed by Centerview and Goldman were based on

reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that positive fairness opinions could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Centerview's and Goldman's opinions and analyses should factor into their decision whether to vote in favor of the Proposed Transaction.

45.   The omission of this material information renders the statements in the "Certain GW Forecasts" and "Opinions of Financial Advisors of GW" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

46.   The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other GW stockholders will be unable to make an informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

47.   Plaintiff repeats all previous allegations as if set forth in full.

48.   During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

49.   By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement. The Proxy

Statement was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about the Company's and Jazz's financial projections and the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Centerview and Goldman. The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

50. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

51. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

52. Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

### COUNT II

**Claims Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

53. Plaintiff repeats all previous allegations as if set forth in full.

54. The Individual Defendants acted as controlling persons of GW within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of GW, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

55. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy Statement.

57. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

58. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, GW's stockholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in her favor on behalf of GW, and against defendants, as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to GW stockholders;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: March 26, 2021

**WEISSLAW LLP**
Joel E. Elkins

By: */s/ Joel E. Elkins*

Joel E. Elkins
9100 Wilshire Blvd., #725 E.
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348
    -and-
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: 212/682-3025
Facsimile: 212/682-3010

*Attorneys for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS